IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| DANIEL POSEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:15-cv-787-ECM-WC |
| | ) | |
| HYUNDAI MOTOR | ) | |
| MANUFACTURING ALABAMA, | ) | |
| | ) | |
| Defendant. | ) | |

## RECOMMENDATION OF THE MAGISTRATE JUDGE

## I.    INTRODUCTION

After prior developments and rulings, the lone remaining claim presented in

Plaintiff Daniel Posey's ("Plaintiff") Amended Complaint (Doc. 37) is his claim that

Defendant, Hyundai Motor Manufacturing Alabama ("Defendant" or "HMMA"),

unlawfully terminated his employment on the basis of his disability, in violation of the

Americans with Disabilities Act ("ADA").[1]  *See* Doc. 37 at ¶¶ 40-43, 49-54.  Presently

---

[1]  For a more thorough explanation of prior legal developments, the undersigned points the reader to two previous Recommendations entered in this case.  In the first Recommendation (Doc. 36), entered on March 11, 2016, the undersigned recommended that Plaintiff's Motion for Leave to File Amended Complaint Narrowing the Scope of the Action (Doc. 33) be granted.  That Recommendation was adopted, without objection, by the District Judge in an Order (Doc. 39) entered on April 4, 2016.  Plaintiff's original Complaint (Doc. 1) leveled claims under the Family Medical Leave Act ("FMLA") and the ADA against Defendant and its third-party benefit services coordinator, The Hartford Comprehensive Employee Benefit Services Company, as well as claims for "systemic FMLA interference and disability discrimination" on behalf of a class of current and former employees of Defendant.  After Plaintiff voluntarily dismissed his claims against The Hartford (Doc. 31), he requested leave to file his proposed Amended Complaint, which was granted.  Plaintiff's Amended Complaint omitted Plaintiff's claims under the FMLA and the class allegations of the original Complaint, leaving only Plaintiff's individual

before the court is Defendant's Motion for Summary Judgment (Doc. 57).  Plaintiff has

filed a Response (Doc. 63) and Defendant has filed a Reply (Doc. 65).  The District Judge

has referred this matter to the undersigned United States Magistrate Judge "for

consideration and disposition or recommendation on all pretrial matters as may be

appropriate."  Doc. 7.  The motion is fully briefed and is ripe for recommendation to the

United States District Judge.   For the reasons that follow, the undersigned

RECOMMENDS that Defendant's Motion for Summary Judgment (Doc. 57) be

GRANTED.

## II.    STANDARD OF REVIEW

Under Rule 56(a) of the Federal Rules of Civil Procedure, a reviewing court shall

grant a motion for "summary judgment if the movant shows that there is no genuine issue

as to any material fact and that the moving party is entitled to a judgment as a matter of

law."  Fed. R. Civ. P. 56(a).  Only disputes about material facts will preclude the granting

of summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  "An

issue of fact is 'genuine' if the record as a whole could lead a reasonable trier of fact to

find for the nonmoving party.  An issue is 'material' if it might affect the outcome of the

---

ADA causes of action for alleged discriminatory discharge and failure to provide a reasonable accommodation.

On January 24, 2017, the undersigned entered another Recommendation (Doc. 46), this time recommending that Defendant's Renewed Motion for Judgment on the Pleadings (Doc. 40) be granted in part and denied in part.  Specifically, the undersigned recommended that Defendant's motion for judgment on the pleadings be granted as to Plaintiff's untimely failure-to-accommodate claim, but denied as to Plaintiff's discriminatory discharge claim.  That Recommendation was adopted, over the partial objections of Plaintiff and Defendant, in an Order (Doc. 50) entered by the District Judge on March 22, 2017.

case under the governing law." *Redwing Vehicleriers, Inc. v. Saraland Apartments*, 94 F.3d 1489, 1496 (11th Cir. 1996) (quoting *Anderson*, 477 U.S. at 248).

Under Rule 56, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact." *Id.* at 323. The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of his case on which he bears the ultimate burden of proof. *Id.* at 322–23.

Once the movant has satisfied this burden, the nonmoving party must "go beyond the pleadings and by his own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324. In doing so, and to avoid summary judgment, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The parties must support their assertions "that a fact cannot be or is genuinely disputed" by "citing to particular parts of materials in the record, including depositions, documents, electronically

stored information, affidavits or declarations, stipulations[], admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A) & (B).

If the nonmovant "fails to properly address another party's assertion of fact" as required by Rule 56(c), then the court may "consider the fact undisputed for purposes of the motion" and "grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it." Fed. R. Civ. P. 56(e)(2) & (3).

In determining whether a genuine issue for trial exists, the court must view all the evidence in the light most favorable to the nonmovant. *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003). Likewise, the reviewing court must draw all justifiable inferences from the evidence in the nonmoving party's favor. *Anderson*, 477 U.S. at 255. However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam). Furthermore, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990); *see also Anderson*, 477 U.S. at 249-50 ("If the evidence [on which the nonmoving party relies] is merely colorable, or is not significantly probative, summary judgment may be granted.") (internal citations omitted).

4

## III.   STATEMENT OF UNDISPUTED FACTS

In the court's Order setting guidelines for the filing of dispositive motions, the parties were directed, prior to filing dispositive motions and responses thereto, to "confer and agree upon the facts which are uncontested," and were further advised that the court would "rely upon the parties' representations in its determination of whether there is a genuine issue of material fact."  Doc. 54 at 2.  Consistent with this directive, the parties have presented identical agreed "uncontested" facts, which are as follows:

> HMMA manufactures automobiles in Montgomery, Alabama.  Posey was employed by HMMA from June 20, 2005, until his December 1, 2014 discharge was affirmed by peer review on December 9, 2014.

> At all relevant times, HMMA maintained EEO, attendance, disciplinary, and discharge policies.  The EEO policy in relevant part provides:

>> It is the policy of HMMA to prohibit discrimination against individuals with disabilities. HMMA will provide reasonable accommodations to qualified individuals with disabilities when necessary to enable them to perform the job's essential functions and enjoy the job's benefits. The individual Team Member, job applicant or other individual should identify themselves as an individual with a disability when seeking an accommodation, demonstrate how the disability impacts their job, and suggest an effective means of accommodation. Supporting medical documentation will be kept confidential.

> The attendance policy in relevant part provides:

>> Attendance will be calculated using a rolling calendar year using the following formula:
>> • Calculate the number of workdays. Workdays will include all scheduled workdays minus all excused absences.
>> • Calculate the number of unexcused workdays.
>> • Subtract the number of unexcused workdays from the number of workdays and divide the remainder by the

number of workdays to arrive at the Team Member's attendance percentage.
• Example:
237 Scheduled workdays
- 15 Excused absences (holidays, vacation, etc.)
222 Workdays
- 5 Unexcused workdays
217 Days worked
217/222 = 97.7%

\* \* \*

When a Team Member's attendance falls below 98% at any time during the first year or subsequent years of employment during any rolling twelve-month period, corrective action will be considered. The rolling twelve-month period is a 365-day period. The following will be considered when issuing corrective action for attendance:

• Cause
• Frequency
• Patterns
• Failure to report
• Time pattern of reporting

\* \* \*

All Team Member attendance records will be maintained by HMMA's Kronos system. If any necessary corrective action is taken by the management team, the appropriate Team Relations Representative must be in attendance.

The corrective action process is intended to help Team Members correct any attendance problems. However, if the Team Member's attendance continues to be unacceptable it could result in further corrective action up to and including termination.

When a Team Member's attendance percentage falls below the acceptable standard, corrective action may be considered. Corrective action is not automatic. Each Team Member's attendance record will be reviewed based on its own merit, and the circumstances in each case are considered. However, when

6

corrective action is taken, the following steps must be followed:

- Informal Discussion (Phase I)
- Formal Discussion (Phase II)
- Commitment Discussion (Phase III)
- Further attendance issues can result in termination.

The Team Relations Representative will be consulted for guidance at each step of the aforementioned corrective action steps. The Team Relations Representative will also attend each step as it occurs.

When corrective action is required beyond the three (3) steps above, the Team Member's Manager will contact the Team Relations Management and request a review of the Team Member's record for termination. No termination of employment will take place unless the action is reviewed and approved by the Team Relations Manager, Department Management, and Head of Human Resources.

The disciplinary policy in relevant part provides:

The intent of corrective action is to provide a consistent way to address unacceptable attendance, performance or conduct issues. Corrective action is designed to allow Team Members a formal notice and the opportunity to correct any performance deviations from HMMA's acceptable standards.

Corrective action procedures will be taken by HMMA's management in order to address a Team Member's inability to meet HMMA's standards regarding attendance, performance, or conduct. Corrective action applies to all levels of HMMA Team Members. A Team Relations Representative will be available and must attend each phase of the corrective action procedure. Corrective action will be administered sequentially with regard to all attendance situations. Specific performance related issues regarding performance, quality and conduct will be evaluated on a case-by-case basis, and corrective action may be applied based on the severity of the performance issue.

\* \* \*

7

The Corrective Actions Steps are as follows:

### *Informal Discussion – Phase I*

Phase I of corrective action is to address minor performance problems. The intent of Phase I is to bring the performance problem to the Team Member's attention through an Informal Discussion. The management team is responsible for conducting the Informal Discussion. The Team Relations Representative will attend the Informal Discussion and serve as a witness. The Informal Discussion is an open discussion between the Team Member and the management team that identifies the nature of the problem and the possible solution.

If the performance problem is corrected and no additional problems develop during the following twelve (12) months, the documented Informal Discussion will be removed from the Team Member's file and will not be used for any future corrective action.

### *Formal Discussion – Phase II*

The Formal Discussion is the Phase II of corrective action and is to be used for more serious performance issues or if a Team Member fails to correct an existing performance issue after receiving an Informal Discussion, or if it is decided that a Team Member's performance issue is serious enough that it warrants a higher phase of corrective action. The Team Member will be given a Formal Discussion Letter. Attendees at the Formal Discussion phase are the management team, the Team Relations Representative and the Team Member. The management team will prepare a Formal Discussion Letter addressed to the Team Member summarizing the performance issue. If the performance issue is corrected and no additional performance issues arise during the following twelve (12) months, the Formal Discussion Letter will be removed from the Team Member's file and will not be used for any future corrective action.

### *Commitment Discussion – Phase III*

The Commitment Discussion is the Phase III of corrective action. This phase will be used if a Team Member's

performance continues to be unacceptable or the Team Member commits a serious action that requires a higher level of corrective action. A Commitment Discussion is a formal meeting which is conducted with the affected Team Member, his or her management team, Team Relations Representative, and Team Relations Management. The purpose of this phase of corrective action will be to determine what aspects of the Team Member's performance are unacceptable, why they are unacceptable, and the reasons behind the Team Member's performance problem. The Team Member's management team will provide the Team Member with a Commitment Discussion Letter. The Team Member will be required to write an action plan stating what actions he or she will take to resolve the performance problem. The Commitment Discussion Letter and the Team Member's action plan will remain in the Team Member's personnel file for a period of twenty-four (24) months. If the Team Member is able to correct the performance problem and no additional problems develop, the Commitment Discussion Letter and the Team Member's action plan will be removed from the Team Member's personnel file and will not be used for any future corrective action.

**Phase III is the final phase of corrective action for attendance related issues.**

The employment termination part states:

HMMA and its Team Members have a mutual interest in maintaining job security and stability in our organization. Because of our mutual interest, HMMA and its management team hope that we never have to terminate a Team Member's employment. However, in situations where a Team Member refuses to respond to the steps in the "Corrective Action Program" outlined above, or if a Team Member's actions are such that HMMA feels his/her employment cannot be continued, the Team Member will be terminated. The Team Relations Manager, the HOD of Production, and the HOD of Human Resources will review all facts and information before any termination decision is made.

During 2013, Posey was diagnosed with Crohn's disease.

9

Doc. 60 at 1-7; Doc. 63 at 1-5 (all citations and footnotes omitted).  In addition to the above agreed, uncontested facts, the undersigned finds the following facts undisputed:

Plaintiff's Crohn's disease causes him to experience severe symptoms, including diarrhea, vomiting, gastrointestinal bleeding, abdominal cramping and pain, and weight loss.  Decl. of Daniel Posey ("Posey Dec.") at ¶ 1, Ex. C to Pl.'s Resp. (Doc. 64-3).  During flareups, Plaintiff experiences the frequent and uncontrollable need to use the restroom.  *Id.*  This limits his ability to work during flareups because he is unable to be away from the restroom long enough to timely complete his job duties.  *Id.*  HMMA uses its third-party benefits coordinator, The Hartford, for employee FMLA administration.  Affidavit of Scott Gordy ("Gordy Aff.") (Doc. 58-1) at ¶ 8.  In general, The Hartford does not disclose an employee's serious health conditions to HMMA management unless necessary for purposes of investigating potential fraud or handling employee accommodation requests.  *Id.* at ¶ 8(a), (c).

Although Plaintiff was disciplined multiple times early in his employment at HMMA for attendance issues, after his Crohn's diagnosis in 2013, Plaintiff's attendance began to suffer markedly, leading to the disciplinary actions that culminated in his termination in December 2014.  In relevant part, Plaintiff received a Phase I - Informal Discussion from Group Leader Jay Burns on December 19, 2013, when his attendance fell below 98%, reaching 97.1%, in the rolling 12-month calendar year HMMA uses to assess its employees' attendance for disciplinary purposes.  *See* Def.'s Ex. 16 to Deposition of Daniel Posey (Doc. 58-4 at 44).  Plaintiff next received a Phase II – Formal Discussion from Group Leader Rick Hendley on May 27, 2014, when his attendance percentage dipped

to 93.94%.  Def.'s Ex. 17, *id.* at 45.  After entering Phase II on May 27, 2014, Plaintiff again missed work on May 30, 2014, dropping his attendance percentage to 91.99%.  Def.'s Ex. 18, *id.* at 46.  In a Team Relations Memorandum prepared in conjunction with HMMA management's request to place Plaintiff in Phase III due to his attendance, Team Relations noted 18.5 unpaid-unexcused absences in the calendar year ending June 2, 2014.  *Id.*  On June 3, 2014, Plaintiff was placed in Phase III – Commitment Discussion for his attendance.  Def.'s Ex. 19, *id.* at 49.

As part of his Phase III discipline, Plaintiff was required to author a statement of his commitment to correcting the behavior that led to the discipline.  In doing so, Plaintiff made clear that he believed The Hartford had erroneously and unfairly denied him FMLA leave for several prior unexcused absences:

> I was diagnose with Chrons disease about a year ago. Through this time of Illness I was hospitalized for internal bleeding for the period of one week. I almost died. I was out of work for 1 month. Julie Pitts, Jay Burns, and Hartford was notified and sent documentation to back this. After I return to work I was notified that I was approved. November-December came, then I was told I was denied By Hartford and It was to late to get paperwork filled out correctly. I was put in phase I by Jay Burns / Team Relations. Around Mid-May I had flare up and complications again. My Dr. done procedure to make sure I wasn't Bleeding again and corrected my medicine. Julie Pitts, Rick Henley and Hartford was contacted. FMLA was Approved. I was notified one week ago that it was denied because paperwork hasn't been received. But It was to late to turn it in after I sent it in personally after I was notified. I was put into Phase II for Attendance. I have been on time, and committed to my job for 9 years. I am going to do and make extra effort to show up to my job as I have been. And give 150% to my team daily. But I feel that I have been punished for my sickness because of HARTFORD. And I also feel that since I have documentation this should be removed from my file. As of this day I pledge to have perfect attendance, as I had, and work diligently with my team to get my Attendance Back to 100%.

Def.'s Ex. 20, *id.* at 50.

11

Following his placement in Phase III of the corrective action process, Plaintiff apparently worked several months without another unpaid-unexcused absence from work. However, on November 6, 2014, he once again missed work, for reasons unrelated to his Crohn's, and, because he had no remaining vacation time to excuse the absence, his attendance percentage fell to 96.9%.[2]   Def.'s Ex. 21, *id.* at 51.   Although Plaintiff's attendance percentage had improved from the low 90s when he was placed in Phase III in June, he did not build his attendance percentage back above 98% before his November 6, 2014, unexcused absence.   Gordy Dep. (Doc. 58-2) at 17:4-6.[3]   Plaintiff's management therefore requested a review of his employment for termination.   Def.'s Ex. 21, Doc. 58-4 at 51.

---

[2]   Plaintiff had previously scheduled a vacation day for November 6, 2014.  However, because he was denied medical leave for several prior absences, his available vacation days were used to cover some of those prior absences, such that he had no more vacation days remaining at the time of his November 6, 2014, absence.  Plaintiff testified that his Group Leader, Rick Hendley, confirmed that he had one remaining vacation day on November 5, 2014.  Doc. 58-3 at 83:5-19.  For his part, Hendley testified that, in addition to KRONOS, he kept a handwritten record of his subordinates' schedules, including scheduled vacation, on a dry-erase whiteboard for quick day-to-day reference. Hendley Dep. (Doc. 64-1) at 27:8-28:20.  However, Hendley also testified that, ultimately, "team members are told to make sure that they keep track of their days, especially in the case of FMLA, because those days can be out in limbo waiting for approval or disapproval.  So it becomes difficult to keep that calendar accurate."  *Id.* at 29:3-8.  Despite this, Plaintiff testified that he did not independently verify whether he had any remaining vacation days by, for instance, checking his pay stub.  Doc. 58-3 at 84:9-14.  Defendant also produced evidence that someone, presumably Plaintiff, used Plaintiff's unique password to check Plaintiff's available vacation time on HMMA's employee intranet website on September 22, 2014.  *Id.* at 95:15-97:10; Ex. 30 to Posey Dep. (Doc. 58-3 at 71).

[3]   Indeed, in order to fall more than one full percentage point (from a minimum 98% to 96.9%) for missing work on November 6, Plaintiff would have to have had fewer than 100 work days— meaning scheduled work days not including holidays or excused leave—in the rolling year preceding November 6, 2014.  Nothing in evidence supports that Plaintiff had so few workdays in the year preceding November 6.

On November 21, 2014, Scott Gordy, the Senior Manager for Human Resources, attended a "decision meeting" with other members of HMMA management to discuss Plaintiff's employment.   Gordy Aff. (Doc. 58-1) at ¶ 10(b); Gordy Dep. (Doc. 58-2) at 14:12-20.   Gordy had no involvement at any prior phase of discipline of Plaintiff prior to the meeting.   Doc. 58-1 at ¶ 10(a); Doc. 58-2 at 17:11-18:6.   At the meeting, Gordy considered only the Team Relations Memorandum prepared as a result of management's request to proceed with a review of Plaintiff's employment.   Doc. 58-1 at ¶ 10(c).   In his role as a manager in Human Resources, Gordy made the decision to terminate Plaintiff's employment based upon the information in the Team Relations Memorandum.   Doc. 58-1 at ¶ 10; Doc. 58-2 at 12:3-13.   In particular, Gordy determined to terminate Plaintiff's employment because, as set forth in the memorandum, Plaintiff had another absence while in Phase III and his attendance percentage was below 98%.   Doc. 58-1 at ¶ 10(h); Doc. 58-2 at 16:20-17:3.   As part of his investigation, Gordy double-checked Team Relations' math to ensure that Plaintiff's attendance percentage was below 98%.   *Id.* at ¶ 10(c)(2).   While the Team Relations Memorandum indicates that several of Plaintiff's charged absences during the previous year were for "denied medical" leave, it makes no mention of Plaintiff's Crohn's or any other disability as the cause of the "denied medical" leave.   *See* Doc. 58-4 at 51-54.   In addition, the Memorandum lists forty-two instances in which HMMA team members were "terminated for missing time after being placed in the final phase of Corrective Action for Attendance."   *Id.* Gordy had no knowledge of Plaintiff's Crohn's, and it was not discussed at the "decision meeting" he attended.   Doc. 58-1 at ¶ 10(i); Doc. 58-2 at 33:7-12.

13

Pursuant to HMMA policy, an employee terminated for attendance issues may request peer review of the decision to terminate. Doc. 58-1 at ¶ 7. The terminated employee is permitted to choose members of the peer review board from a list of employee team members and management who have volunteered to serve in such capacity and have completed appropriate training. *Id.* at ¶ 7(b). At the hearing, the terminated employee is permitted to address the review board and explain his or her position regarding the termination. *Id.* at ¶ 7(a). A designated member of management will also be permitted to explain management's position to the peer review board. *Id.* Only the review board is permitted to call witnesses, and the employee and management are not permitted to debate each other at the hearing. *Id.* The peer review board votes by secret ballot immediately after the appeal hearing, and its decision is based on simple majority rule. *Id.* The peer review board's decision becomes final and binding only if it is not reversed by "the highest levels of management of HMMA's HR and legal departments" within two working days. *Id.*

Following Gordy's decision to terminate Plaintiff, Plaintiff proceeded to the peer review stage. Plaintiff selected the review board members. Doc. 58-4 at 65. At the hearing, Plaintiff presented his position to the peer review board, explaining that he had an illness and that he was denied medical leave for many of his absences due to problems with his paperwork. Posey Dep. (Doc. 58-3) at 89:15-90:9.[4] HMMA management was

---

[4] Plaintiff equivocates on the specific issue of whether he advised the peer review board that he had Crohn's. *Compare* Doc. 58-3 at 89:15-16 ("I told them that I recently got diagnosed with Crohn's, and I was having problems getting adjusted to my medicine, and there was days that I had to be compensated, that I had to take off, I couldn't control what was going on.") *with id.* at

represented by Patrick Purter at the peer review board hearing.  Purter Dep. (Doc. 64-2) at 31:12-15.  Purter was a Production Manager over general assembly at HMMA.  *Id.* at 7:21-8:6.  Purter was one of the managers over Plaintiff.  *Id.* at 10:15-11:15.  Although there is some dispute about the content of Purter's statements to the peer review board on behalf of management, there is no dispute that he did not address Plaintiff's Crohn's or otherwise speak about any illness or disability affecting Plaintiff.[5]  The five-member peer review board voted to uphold Gordy's termination of Plaintiff by a vote of three to two.  *See* Ex. J to Pl.'s Resp. (Doc. 64-10) at 7-8; Posey Decl. (Doc. 64-3) at ¶ 6.  The peer review board's decision was not reversed by the "highest levels" of HMMA management, making Plaintiff's termination final and binding.

## IV.   DISCUSSION

As discussed previously, Plaintiff alleges that Defendant terminated his employment because of his disability.  Doc. 37 at ¶¶ 40-43, 49-54.  The ADA prohibits an employer from terminating "a qualified individual on the basis of disability."  42 U.S.C. § 12112(a).  This Circuit utilizes the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), in resolving employment discrimination cases arising

---

91:5-16 (indicating he does not recall whether he told the peer review board whether he had Crohn's or what was the nature of his illness).

[5]   While Purter testified that he only generally described how HMMA's corrective action process works to the peer review board (*see* Doc. 64-2 at 31:19-22, 34:5-35:12), Plaintiff testified that Purter brought up a host of past disciplinary issues that were not related to the absences forming the basis for his termination (s*ee* Doc. 58-3 at 92:2-22).  The Team Member Review Board Facilitator Packet clarifies that Purter would be asked to "present the circumstances which caused the termination" before Plaintiff would be allowed to present his position.  Ex. J to Pl.'s Resp. (Doc. 64-10) at 10.  In addition, both Purter and Plaintiff would be allowed to make "closing remarks" after both sides had presented their positions.  *Id.*

under the ADA.  *Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1247, 1255 (11th Cir. 2007). "Under this burden-shifting analysis, [Plaintiff has] the initial burden of establishing a prima facie case of disability discrimination."  *Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189, 1193 (11th Cir. 2004) (citing *Wascura v. City of S. Miami*, 257 F.3d 1238, 1242 (11th Cir. 2001)).   To establish a prima facie case of unlawful disability-related termination, Plaintiff must show (1) that he is disabled; (2) he is a qualified individual; and (3) that he was terminated because of his disability.  *Jarvela v. Crete Carrier Corp.*, 776 F.3d 822, 828 (11th Cir. 2015) (citing *Pritchard v. S. Co. Serv.*, 92 F.3d 1130, 1132 (11th Cir. 1996)).

If Plaintiff establishes a prima facie case of discrimination, "which establishes a presumption of discrimination," the burden shifts to Defendant "to articulate a legitimate, non-discriminatory reason for [Plaintiff's] termination."  *Cleveland*, 369 F.3d at 1193 (citing *Wascura*, 257 F.3d at 1242).  This burden is merely one of production; Defendant need not "persuade the court that it was motivated" by the legitimate, non-discriminatory reason that it proffers.  *Id.*  Once such a legitimate, non-discriminatory reason is given, "the inferential presumption of discrimination [is] eliminated," and Plaintiff is "left with the ultimate burden of proving that [Defendant] intentionally discriminated against [him] because of his disability."  *Id.*  In order to do so, Plaintiff must produce evidence tending to show that Defendant's proffered reasons are "unworthy of credence" and, hence, are a pretext for discrimination.  *Id.*

In pertinent part, Defendant argues that Plaintiff has not established a prima facie case of disability discharge discrimination and, even if he had, he has not shown that

16

Defendant's proffered reason for his discharge—excessive absenteeism—is a pretext for disability discrimination. Pl.'s Br. (Doc. 60) at 15-19. The court first considers whether Plaintiff has established a prima facie case of disability discharge discrimination.

### A.    Plaintiff has not established a prima face case.

Defendant asserts that Plaintiff cannot establish a prima facie case of disability discharge discrimination because he cannot show that the decisionmaker—Gordy—was aware of Plaintiff's disability and because there is no evidence establishing an inferential presumption of discrimination. *Id.* at 16-17. Plaintiff, on the other hand, argues, as to Defendant's first contention, that the record shows that the decision to terminate his employment was the product of "multiple levels of decisionmaking" and that "individuals involved in each of the levels of the termination process knew that Plaintiff had Crohn's." Pl.'s Resp. (Doc. 63) at 18. As to Defendant's second contention, Plaintiff argues that he has established an inference of disability discharge discrimination by presenting evidence of numerous comparators, i.e., "he has identified numerous individuals who had absences while on Phase III but were not terminated, and two individuals who had absences while on [P]hase III that brought their attendance percentages below 98%." *Id.* at 19. The undersigned will consider each argument in turn.

With regard to Defendant's first argument—decisionmaker knowledge of Plaintiff's Crohn's—the Eleventh Circuit has long recognized that "a decision-maker who lacks actual knowledge of an employee's disability cannot fire the employee 'because of' that disability." *Cordoba v. Dillard's Inc.*, 419 F.3d 1169, 1186 (11th Cir. 2005). *See also Williamson v. Clarke Cty. Dep't. of Hum. Res.*, 834 F. Supp. 3d 1310,1322-24 (S.D. Ala.

2011) (finding that plaintiff failed to establish a prima facie case of disability discrimination because defendant's decisionmaker "categorically denie[d] awareness of [plaintiff's] disability" and plaintiff failed to present sufficient evidence of such knowledge).  As set forth above, Defendant has produced undisputed evidence that its decisionmaker, Gordy, had no knowledge of Plaintiff's Crohn's.  Because Plaintiff cannot rebut this evidence and show that indeed Gordy did know about his Crohn's, Plaintiff pivots to the argument that, despite Gordy's testimony that he was the sole decisionmaker, he was not in fact the sole decisionmaker.  Instead, the argument goes, the decision to terminate was the product of "multiple levels" of decisionmaking, and that "individuals involved in each of the levels of the termination process knew that Plaintiff had Crohn's." Doc. 63 at 21.  Unfortunately for Plaintiff, his argument rests merely on conjecture that is insufficient to rebut Defendant's evidence of the lack of decisionmaker knowledge.

Plaintiff first asserts that Purter and Hendley, whom he asserts had knowledge of his Crohn's, were responsible for the request to review his employment for termination. *Id.*  Of course, Plaintiff's superiors' request for review of Defendant's attendance by Team Relations is not tantamount to a decision to terminate Plaintiff's employment.  Next, Plaintiff asserts that "the record (interpreted in the light most favorable to the Plaintiff) reflects that after Purter's and Hendley's recommendation, the decision to proceed with termination was actually made in a group meeting at which Director of Production Craig Stapley and Hyundai General Counsel Chris Whitehead also were present." *Id.*  Because Stapley knew of Plaintiff's Crohn's, Plaintiff asserts, a "reasonable jury could thus find that at least one of the decisionmakers involved in the initial termination meeting was

aware that Plaintiff had Crohn's." *Id.* As discussed above, although Gordy testified that he attended a "decision meeting" with Stapley and Whitehead to discuss Plaintiff's employment, nothing in the record suggests that the actual decision to terminate Plaintiff's employment was made by Stapley or Whitehead, or even that it was a collective decision by those persons and Gordy. That is, Plaintiff has produced no evidence about the influence of either Stapley or Whitehead on the decision to terminate. Given Gordy's unequivocal testimony that he alone made the decision to terminate, nothing in the record suggests that Stapley or Whitehead were anything more than consultants or a "sounding board" for Gordy's deliberations.[6] Furthermore, Plaintiff has not produced any evidence that the topic of his Crohn's was even broached at the "decision meeting," notwithstanding Stapley's purported knowledge of the condition.

Plaintiff next asserts that the "final decisionmakers—the employees who voted in the review board process—also were aware that Plaintiff had Crohn's." Doc. 63 at 19. But Plaintiff presents no authority for his position that peer review of an employer's decisionmaker's decision somehow substitutes the peer review group for the actual decisionmaker. Even if he had produced such authority, as set forth above, HMMA's peer review process makes clear that the peer review board is not, in fact, the "final

---

[6]  In his statement of "Additional Undisputed and Disputed Facts," Plaintiff asserts that record support for his contention about supposed multiple decision makers is the portion of Gordy's deposition in which he unequivocally testified both that he alone made the decision to terminate and that he made the decision at the "decision meeting." *See* Pl.'s Br. (Doc. 63) at 16 (citing Gordy Dep. (Doc. 58-2) at 13:1-14:20)). Nothing in the cited portion of the record, or any other part of the record, suggests that, contrary to his testimony, anyone other than Gordy was responsible for the ultimate decision to terminate Plaintiff.

decisionmaker" because the board's decision is presented to the "highest levels of management of the HR and Legal Departments," which is vested with the ultimate authority to reverse the board's decision. Thus, Plaintiff's effort to circumvent Gordy's undisputed lack of knowledge of his disability by interposing the peer review board is unavailing. Because Plaintiff has produced no evidence that anyone other than Gordy made the decision to terminate his employment, regardless of where he might have made such decision, and he has produced no evidence that Gordy was aware of his disability, Plaintiff has not established decisionmaker knowledge of his disability, and, consequently, he has not established a prima facie case of disability discrimination. *Williamson*, 834 F. Supp. 2d at 1323-24.

Defendant also argues that Plaintiff has failed to establish a prima facie case because he has not produced evidence permitting an inference of disability discharge discrimination. Plaintiff argues that he can show an inference of disability discrimination via comparator evidence, "as he has identified numerous individuals who had absences while on Phase III but were not terminated, and two individuals who had absences while on Phase III that brought their attendance percentages below 98%." Doc. 63 at 19. Plaintiff asserts that any of these several employees can serve as a similarly-situated comparator to Plaintiff because Defendant's attendance policy "makes clear that [c]orrective action is not automatic and states that further attendance issues can result in termination after an individual is placed on Phase III." Doc. 63 at 23 (internal quotations omitted).

"In determining whether employees are similarly situated for purposes of establishing a *prima facie* case, it is necessary to consider whether the employees are

involved in or accused of the same or *similar conduct* and are disciplined in different ways." *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997) (emphasis in original). Plaintiff bears the burden of showing that the comparators he identifies are "similarly situated in all relevant respects." *Knight v. Baptist Hosp. of Miami, Inc.*, 330 F.3d 1313, 13116 (11th Cir. 2003).

As set forth in the agreed undisputed facts, Defendant's attendance policy establishes 98% as the minimum acceptable threshold for employee attendance: "When a Team Member's attendance falls below 98% at any time during the first year or subsequent years of employment during any rolling twelve-month period, corrective action will be considered." While Plaintiff highlights a number of employees who were not terminated despite having additional unexcused absences while on Phase III, he only cites to two such employees who were not terminated even though, like Plaintiff, their attendance percentage dropped below 98% while on Phase III. The undersigned finds that employees who missed days while on Phase III, but whose attendance percentage did not fall below Defendant's minimum acceptable threshold for attendance, are not viable comparators to Plaintiff. Unfortunately for Plaintiff, even as to the two employees whose attendance percentage did fall below 98% while on Phase III, both of these supposed comparators are easily distinguishable from Plaintiff.

The first purported comparator, Britton Boone, had his attendance percentage dip approximately .06 points below 98%, to 97.94%, due to an absence while on Phase III, but his percentage was once again above 98% the following workday. Gordy Aff. (Doc. 58-1) at ¶ 13(b). In addition, there is no evidence showing that, unlike Plaintiff, Boone's

attendance was below 98% at the time of his absence while on Phase III.  Indeed, if Boone's attendance percentage was back above 98% the following workday, then his attendance percentage on the day of the absence necessarily exceeded, if only slightly, the 98% threshold.  On the other hand, while Plaintiff had commendably been working toward improving his attendance percentage from the low 90s when he entered Phase III in June of 2014, he had not yet gotten back above the 98% threshold at the time of his November 6, 2014, unexcused absence which knocked his attendance percentage down to 96.9%. Gordy Dep. (Doc. 58-2) at 17:4-6; *supra*, n.3.  As such, Boone is plainly distinguishable.

Plaintiff's other supposed comparator is an HMMA employee whose attendance dropped to 97.17% following an unexcused absence while on Phase III.  Defendant has submitted affidavit, deposition, and documentary evidence relating to this employee under seal.  *See* Doc. 61.  In pertinent part, when confronted by Defendant for his unexcused absence, this employee disclosed that he was struggling with substance abuse and requested assistance from Defendant in dealing with his issues.  Defendant took corrective action against this employee in the form of a Letter of Conditional Employment that noted his serious misconduct but allowed him to continue his employment provided that he sought treatment for his condition, via Defendant's employee assistance program (EAP), and that he provide evidence of such treatment to Defendant.  Doc. 61-2; Gordy Dep. (Doc. 58-2) at 59:12-19.  These circumstances contrast markedly with Plaintiff, whose absence while in Phase III was not related to his disability, but was, instead, a vacation day for which he had no remaining vacation time due to previous instances of denied medical leave.  In addition, Plaintiff further argues that, "[e]ven after being given this second chance, this

22

employee had further unexcused absences while under the letter of conditional employment; however, he was still allowed to remain employed." Doc. 63. However, Gordy's testimony on this point makes clear that, even after his additional unexcused absences, this employee's attendance percentage exceeded 98%. Gordy Dep. (Doc. 58-2) at 60:5-62:13. As such, the undersigned cannot conclude that this employee and Plaintiff are similarly situated in all relevant respects and, accordingly, Plaintiff has failed to establish an inference of discrimination by comparator evidence.

If Plaintiff has not established the requisite inference of discrimination via comparator evidence, what is left for Plaintiff to meet his burden? Plaintiff submits that he has raised an inference of discrimination by presenting "several additional forms of circumstantial evidence forming a 'circumstantial mosaic' allowing a reasonable jury to form an inference of discrimination." Doc. 63 at 25. Plaintiff's "circumstantial mosaic" relies on the actions he attributes to Patrick Purter, who, according to Plaintiff, "initiated the termination process by requesting that Plaintiff's employment be reviewed for termination" and, further, "advocated for Plaintiff's termination" on behalf of HMMA management at Plaintiff's peer review board hearing. *Id.* Because Purter did not make the decision to terminate Plaintiff, did not participate in the "decision meeting" where Gordy resolved to terminate Plaintiff, and was not on the peer review board that reviewed Gordy's decision, Plaintiff asserts that Purter used Gordy and the peer review board "as his 'cat's paw' to effect Plaintiff's termination for discriminatory reasons." *Id.*

The Eleventh Circuit has explained that "in some cases, a discharge recommendation by a party with no power to actually discharge the employee may be

actionable if the plaintiff proves that the recommendation directly resulted in the employee's discharge." *Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1331 (11th Cir. 1999).

> One way of proving that the discriminatory animus behind the recommendation caused the discharge is under the "cat's paw" theory. This theory provides that causation may be established if the plaintiff shows that the decisionmaker followed the biased recommendation without independently investigating the complaint against the employee. In such a case, the recommender is using the decisionmaker as a mere conduit, or "cat's paw" to give effect to the recommender's discriminatory animus.

*Id.* at 1332. Applying the "cat's paw" framework of *Staub v. Proctor Hosp.*, 562 U.S. 411 (2011), Plaintiff contends that he has produced sufficient evidence that a jury could find that Purter harbored discriminatory animus against Plaintiff, that Purter was motivated by this animus when he sought Plaintiff's termination, that Purter intended to cause Plaintiff's termination, and that Purter's actions both in requesting that Plaintiff's employment be reviewed for termination and in advocating for his termination before the peer review board were the "but for" cause of Plaintiff's termination. Doc. 63 at 23-27. Defendant, however, maintains that Plaintiff has not established an inference of discrimination under a "cat's paw" theory because (1) Plaintiff "has not established Purter had discriminatory animus he must have to make him the evil influencer of the innocent decisionmaker, and (2) when, as here, 'the decisionmaker conducts his own evaluation and makes an independent decision, his decision is free of the taint of a biased subordinate employee.'" Doc. 65 at 17-18 (quoting *Caldwell v. Clayton Cty. Sch. Dist.*, 604 F. App'x 855, 861 (11th Cir. 2015)).

Defendant's arguments are well-taken. The evidence Plaintiff musters in support of Purter's supposed animus is not "significantly probative" of any such animus by Purter

and, therefore, fails to create a material issue of fact.  *Anderson*, 477 U.S. at 249-50.  First, Plaintiff points to his own representation in his Declaration that Purter "reacted negatively" to his explanation at his Phase III commitment meeting that his absences were due to his Crohn's.  Posey Dec. (Doc. 64-3) at ¶ 3.  Plaintiff discerns Purter's negative reaction to his disease because Purter is purported to have told Plaintiff "it was [his] responsibility to be at work whether [he] had Crohn's or not."  *Id.*  The statement Plaintiff attributes to Purter does not justify the inference that Purter harbored discriminatory animus toward Plaintiff based on his disability.  Rather, at most, it permits the unremarkable inference that Purter deferred to HMMA's and/or The Hartford's judgment about whether Plaintiff deserved medical leave for prior absences.  In other words, Purter believed Plaintiff should be at work, or should have been at work, for absences where he was denied medical leave, notwithstanding his medical condition.

Also unpersuasive as a means of showing Purter's discriminatory animus is the fact that he represented HMMA management at Plaintiff's peer review board hearing.  Plaintiff asserts that "Purter again reacted negatively to Plaintiff bringing up Crohn's, this time by delivering a rebuttal reaching back to unrelated past discipline and performance issues unrelated to Defendant's articulated reason for termination after Plaintiff discussed the effect of his Crohn's had [sic] on his attendance."  Doc. 63 at 24.  However, even under Plaintiff's version of Purter's rebuttal, Purter simply brought up old attendance and performance issues, most of which would have preceded Plaintiff's 2013 Crohn's diagnosis.  *See* Posey Dec. (Doc.64-3) at ¶ 5.   Purter did not address Plaintiff's Crohn's; he did not diminish Plaintiff's suffering with the disease or cast doubt on the veracity of

any of Plaintiff's supposed representations to the peer review board about the effect of his disease on his attendance or ability to work. As such, at most, a jury may reasonably infer from the remarks Plaintiff attributes to Purter only that Purter simply did not believe that, historically, Plaintiff was a very good or reliable employee. Even if this is an incorrect or unfair longitudinal assessment of Plaintiff's employment record, it does not permit the inference that Purter was biased against Plaintiff because of his disability. Accordingly, Plaintiff has failed to put forth any substantial, "significantly probative" evidence that Purter harbored animus toward him because of his disability.

Plaintiff has also failed to present evidence that would permit a reasonable inference that Purter's actions were the but-for cause of his termination. While, in his capacity as a manager, Purter may have been involved in the decision to request a review of Plaintiff's employment for termination after his November 6 absence, Plaintiff has produced no evidence that Purter otherwise influenced Gordy's decision to terminate Plaintiff. There is no evidence that Purter had any conversations or otherwise communicated with Gordy regarding Plaintiff's employment. Purter did not attend the "decision meeting" at which Gordy decided to terminate Plaintiff. Further, the evidence shows that Gordy independently considered the Team Relations Memorandum, which was not prepared by Purter or based upon any input from him, discussing Plaintiff's absences and discussing other instances in which employees were terminated for similar attendance issues. Gordy Aff. (Doc. 58-1) at ¶ 10(c). Gordy also independently confirmed the calculations set forth in the Team Relations Memorandum in the course of his investigation. *Id.* ¶ 10(c)(2). As such, the evidence shows that, even if Purter had been animated by discriminatory intent

in merely requesting that HMMA Team Relations review Plaintiff's employment, Gordy's independent consideration and investigation of the circumstances surrounding Plaintiff's absence broke any chain of causation connecting Purter's purported discriminatory animus and Plaintiff's termination.  *See, e.g., Dwyer v. Ethan Allen Retail, Inc.*, 325 F. App'x 755, 757-58 (11th Cir. 2009) (holding that plaintiff failed to establish a "prima facie case of discrimination under a cat's paw theory" because the record showed that the decisionmaker "independently investigated [the plaintiff's] conduct and . . . came to her own conclusion that a Policy violation had occurred").  *See also Wood v. Calhoun Cty., Fla.,* 626 F. App'x 954, 956-57 (11th Cir. 2015) (holding that, to the extent that *Staub* might apply in the disability discrimination context, the independent review of the plaintiff's termination by a county Board of Commissioners "broke the causal link between [the plaintiff's] supervisor's alleged animus and his termination").

    To the extent that Plaintiff relies upon Purter's rebuttal before the peer review board to reestablish the causal chain that Gordy's independent investigation broke, his argument is unavailing.  First, as discussed above, Plaintiff has not presented any authority for his proposition that the interposition of a peer review board to review an employer's termination decision that is itself still subject to final review by the employer somehow substitutes the peer review board for the employer's decisionmaker, especially where the peer review board upholds the employer's decision as it did here.  Second, Plaintiff has not produced any substantial, "significantly probative" evidence that Purter's remarks before the peer review board—which, again, did not concern Plaintiff's disability—caused that body to fail to independently consider all of the material it had before it, including the

Team Relations Memorandum, the prior disciplinary charges against Plaintiff, and Plaintiff's own statements before the board about the effects of his disability. Plaintiff posits only that, based upon his interpretation of "the body language of the committee members," after he made his presentation to the board, he believed that he "had won them over." Posey Dec. (Doc. 64-3) at ¶ 5. Putting aside the fact that interpreting body language is inherently subjective and, because it is so nebulous, is highly suspect as a reliable means of judging an arbiter's position in a setting like a formal hearing, Plaintiff does not indicate how many committee members' body language conveyed to him that he had won them over. Given that the committee voted 3-2 to uphold the termination, this is a salient consideration. In any event, even if the board uniformly exhibited receptiveness to Plaintiff, it does not follow that Purter's non-disability-related rebuttal simply could not have been more persuasive to the peer review board, much less that it somehow purged the board of its imprimatur of independence. Because Plaintiff has produced nothing tending to show that the peer review committee did not conduct an independent hearing at which Plaintiff was permitted to present his case, he has presented no evidence justifying the inference that Purter somehow used the committee as a cat's paw to give effect to his own discriminatory animus. *See, e.g., Wood*, 626 F. App'x at 957.

In sum, Plaintiff's evidence about the perceived "negative reaction" of Purter does not establish the "convincing mosaic of circumstantial evidence" that would permit a jury to infer that his termination was the product of intentional discrimination, especially considering that Purter was not the decisionmaker, did not speak with or otherwise influence the decisionmaker's decision to terminate, and nothing else in the record

indicates that Gordy, or the peer review board, failed in their obligations to independently consider the circumstances of Plaintiff's attendance policy violations when discharging their duties.

For all of the foregoing reasons, Plaintiff has failed to establish a prima facie case of disability discharge discrimination.  As such, Defendant's motion for summary judgment is due to be granted.

### B.      Plaintiff has not shown pretext.

Even if Plaintiff could establish a prima facie case of disability discriminatory discharge, Defendant remains entitled to summary judgment because Plaintiff has not shown pretext.  As discussed previously, where a plaintiff establishes a prima facie case, under the *McDonnell Douglas* framework, the burden then shifts to the employer to provide "legitimate, nondiscriminatory reasons for the challenged employment action."  *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997).  This burden is "exceedingly light," as the employer must merely proffer a non-discriminatory reason for the adverse employment action, not prove it.  *Meeks v. Computer Assocs. Int'l*, 15 F.3d 1013, 1019 (11th Cir. 1994) (quoting *Perryman v. Johnson Prods. Co., Inc.*, 698 F.2d 1138, 1142 (11th Cir. 1983)).

Once the employer has proffered a legitimate nondiscriminatory reason for the adverse employment decision, the plaintiff "then has the ultimate burden of proving the reason to be a pretext for unlawful discrimination."  *Denney v. City of Albany*, 247 F.3d 1172, 1183 (11th Cir. 2001).  In order to prove that a defendant's articulated reason is a pretext, a plaintiff must demonstrate not only that the reason is false, but also that

intentional discrimination was the real reason. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993) ("[A] reason cannot be proved to be 'a pretext for discrimination' unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." (emphasis in original)).  To survive a motion for summary judgment, a plaintiff must rebut every legitimate, nondiscriminatory reason for the employment decision. *Crawford v. City of Fairburn, Ga.*, 482 F.3d 1305, 1308 (11th Cir. 2007).

Here, Defendant has offered a legitimate, non-discriminatory reason for its decision to terminate Plaintiff: excessive absenteeism.  In particular, Defendant terminated Plaintiff because he had an unexcused absence while in Phase III of Defendant's corrective action disciplinary scheme and his attendance rate was below HMMA's minimum acceptable rate of 98%.  Plaintiff relies on the same evidence and argument to show pretext that he relied upon in arguing that he has established a prima facie case. *See* Doc. 63 at 21-27.  That is, Plaintiff asserts that his comparator evidence and the "circumstantial mosaic" centered on the actions of Patrick Purter could cause a jury to reject Defendant's articulated reason for his termination.

However, for the reasons discussed previously in this Recommendation, Plaintiff's evidence of pretext is unconvincing and, generally, does not show that Defendant's articulated reason is "unworthy of credence." *Cleveland*, 369 F.3d at 1193.  In short, Plaintiff has failed to name any viable comparator and he has produced insufficient evidence tending to show that Purter harbored any discriminatory animus against him. Moreover, Plaintiff has not shown that, even if Purter was biased against him due to his disability, that such animus, rather than Plaintiff's accumulation of charged absences and

his final absence while on Phase III while his attendance percentage was below HMMA's minimum acceptable threshold, resulted in Defendant's decision to terminate Plaintiff's employment.

Taking a wider view of Plaintiff's evidence in view of his original claims, it is evident that Plaintiff's core grievance stems from the decision to deny him medical leave for numerous absences he experienced in 2013 and 2014.  But Plaintiff did not timely bring any claims under the ADA or FMLA to redress any wrongs that may have been committed related to the denial of medical leave.  So, as his claims were stripped away—he voluntarily dismissed all of his claims against The Hartford, he abandoned his individual and class FMLA claims against Defendant, and his ADA failure-to-accommodate claim against Defendant was dismissed on the pleadings—all that was left for Plaintiff to litigate is his tenuous claim that his termination was the product of disability discrimination despite that it was the direct result of an absence that he admits had nothing to do with his disability.

Unfortunately, the evidence that Plaintiff has mustered in support of this claim is insufficient to raise a question of fact for a jury.  Plaintiff's complaints about Defendant's handling of his prior absences, for which he did not file EEOC charges, ultimately are, even if reasonable, immaterial to the question of whether the decision to terminate his employment was discriminatory.  Likewise, Plaintiff's evidence, consisting mostly of his own testimony, that his November 6, 2014, absence was the result of his being misinformed by a supervisor about his available vacation time is also immaterial.  Narrowing the focus of this court's inquiry to the circumstances surrounding Defendant's discrete decision to terminate Plaintiff, the undersigned is left with the abiding conviction that Plaintiff has

failed to present sufficient evidence such that a jury could find that the termination decision was the product of intentional disability discrimination rather than Defendant's application of its attendance policy. While reasonable people might quarrel with the wisdom of terminating an employee in the circumstances described by Plaintiff, looking at the record as a whole, there is no material dispute of fact regarding whether Defendant's application of its attendance policy was a mere pretext for unlawful disability discrimination. *See, e.g., Flowers v. Troup Cty., Ga., Sch. Dist.*, 803 F.3d 1327, 1338 (11th Cir. 2015) (holding that employment discrimination statutes do "not allow federal courts to second-guess non-discriminatory business judgments, nor does it replace employers' notions about fair dealing in the workplace with that of judges. We are not a super-personnel department assessing the prudence of routine employment decisions, no matter how medieval, high-handed, or mistaken. Put frankly, employers are free to [discipline] their employees for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason.") (quotations omitted).

For all of the foregoing reasons, Plaintiff has not established a prima facie case of discriminatory disability termination. Moreover, to the extent that Plaintiff could establish such a prima facie case, Defendant has provided a legitimate, non-discriminatory reason for its actions which Plaintiff has failed to rebut and disprove. As such, Defendant is entitled to summary judgment on Plaintiff's ADA discriminatory discharge claim.

V.    **CONCLUSION**

For all of the foregoing reasons, the undersigned Magistrate Judge hereby RECOMMENDS that Defendant's Motion for Summary Judgment (Doc. 57) be GRANTED.  It is further

ORDERED that the parties are DIRECTED to file any objections to the said Recommendation on or before **September 12, 2018**.    Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation to which the party is objecting.  Frivolous, conclusive, or general objections will not be considered by the District Court.  The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file written objections to the proposed findings and recommendations in the Magistrate Judge's report shall bar the party from a *de novo* determination by the District Court of issues covered in the report and shall bar the party from attacking on appeal factual findings in the report accepted or adopted by the District Court, except upon grounds of plain error or manifest injustice.  *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982); s*ee Stein v. Reynolds Sec., Inc.*, 667 F.2d 33 (11th Cir. 1982); s*ee also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (*en banc*) (adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981).

Done this 29th day of August, 2018.

/s/ Wallace Capel, Jr.
CHIEF UNITED STATES MAGISTRATE JUDGE

33